IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Lawrence Marvin Richardson, | ) | Civil Action No. 8:12-cv-03507-JDA |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a final Order pursuant to Local Civil Rules 73.02(B)(1) and 83.VII.02, D.S.C.; 28 U.S.C. § 636(c); the parties' consent to jurisdiction by a magistrate judge; and the Honorable David C. Norton's February 10, 2014 Order of reference [Doc. 23]. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons set forth below, the decision of the Commissioner is reversed and remanded pursuant to 42 U.S.C. § 405(g)[2] for an award of benefits.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

## PROCEDURAL HISTORY

Plaintiff filed applications for DIB [R. 99–102, 103–104] and SSI [R.105–108] in January 27, 2010, alleging an onset of disability date of June 3, 2008. Plaintiff's applications were denied initially on June 9, 2010 [R. 43–47], and upon reconsideration on September 8, 2010 [R. 55–56], by the Social Security Administration ("the Administration"). Plaintiff requested a hearing, and on June 10, 2011, Administrative Law Judge ("ALJ") Richard L. Vogel held a hearing on Plaintiff's claims [R. 24–38].

On June 23, 2011, the ALJ issued his decision, finding Plaintiff was not disabled under the Social Security Act ("the Act"). [R. 7–23.] At Step 1,[3] the ALJ found Plaintiff met the insured status requirements of the Act through June 30, 2010 and had not engaged in substantial gainful activity since June 3, 2008, his alleged onset date. [R. 12, Findings 1 & 2.] At Step 2, the ALJ found Plaintiff had severe impairments of borderline intellectual functioning and asthma. [R. 12, Finding 3.] The ALJ also found that Plaintiff had non-severe impairments of diabetes, hypertension, and sleep apnea. [R. 12–13.] At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 13–15, Finding 4.] The ALJ specifically considered Listings 3.02A and 3.03 with respect to Plaintiff's asthma and Listing 12.05 with respect to Plaintiff's borderline intellectual functioning. [*Id.*] Additionally, the ALJ concluded that the combined effects of Plaintiff's impairments, both severe and non-severe, were not at least equal in severity to those described in Listings 3.02, 3.03, 3.10, 12.05, 4.00 and 9.08. [R. 15.]

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

2

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light[4] work as defined in 20 CFR 404.1567(b) and 416.967(b) with no concentrated exposure to lung irritants.

[R. 15, Finding 5.]  Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work.  [R. 18, Finding 6.] However, based on his age, education, work experience and residual functional capacity, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 18, Finding 10.]  Accordingly, the ALJ concluded that, consistent with Medical-Vocational Rule 202.20, Plaintiff had not been under a disability, as defined in the Act, from June 3, 2008, through the date of the decision.  [R. 18–19, Findings 10, 11.]

Plaintiff requested Appeals Council review of the ALJ's decision but on October 10, 2012, the Council declined review.  [R. 1-4.]  On December 12, 2012, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and claims the ALJ

(1)    performed an improper Listing analysis under Listing 12.05C [Doc. 18 at 7–9]; and

---

[4] Light work activity involves lifting and carrying up to 20 pounds occasionally and 10 pounds frequently with walking/standing at least 6 hours in an 8-hour day with sitting the remainder of the time.

(2)     performed a flawed Step 5 analysis by relying on the grids (defined below) although Plaintiff suffered from severe non-exertional impairments [*id*. at 10–11].

Plaintiff argues this case should be remanded for an award of benefits.  [*Id*. at 11–12.]

The Commissioner contends substantial evidence supports the ALJ's decision and that the decision is free from reversible legal error.  [Doc. 20.]  Specifically, the Commissioner contends

(1)     Plaintiff failed to establish that he was presumptively disabled by mental retardation under Listing 12.05C [*id*. at 10–16]; and

(2)     substantial evidence supports the ALJ's finding that Plaintiff could perform other work existing in the national economy [*id*. at 16–19].

## <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is

4

evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial

evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision. *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court

6

enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5] With remand under sentence

---

[5]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders'* construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents

8

the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.     *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.     *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a

9

claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.     *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[6]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

---

[6]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's RFC[7] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the RFC to do his past work. 20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to his prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[8] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving

---

[7]RFC is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[8]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. 20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in

ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

### III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. §§ 404.1517, 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

14

V.     **Pain**

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  Indeed, the Fourth

15

Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

17

## APPLICATION AND ANALYSIS

### Listing 12.05C Analysis

Plaintiff contends the ALJ erred by failing to find Plaintiff's impairments met Listing 12.05C and that the case should be remanded for payment of benefits. [Doc. 18.] Plaintiff argues the ALJ improperly relied on Plaintiff's past work as a delivery person and janitor in finding that Plaintiff's adaptive functioning was consistent with borderline intellectual functioning [*id*. at 8], and failed to consider Plaintiff's lowest IQ scores and, rather, relied on the full-scale IQ score [*id*. at 9]. The Commissioner contends the record failed to show a definitive diagnosis of mental retardation, as Plaintiff's intelligence and functioning were too high. [Doc. 20 at 12.] Additionally, the Commissioner argues that the ALJ properly relied on state agency psychologist, who determined the record evidence did not support a finding that Plaintiff had mental retardation or that he satisfied the requirements of Listing 12.05. [*Id*. at 12.] Further, the Commissioner contends Plaintiff failed to demonstrate deficits in adaptive functioning associated with mental retardation as described in Listing 12.05. [*Id*.] Lastly, the Commissioner submits the ALJ properly considered Plaintiff's past work history, and properly considered Plaintiff's IQ scores during the relevant time period, rather than those prior to age 22. [*Id*. at 14.]

### *Criteria of Relevant Listing*

To determine whether a claimant's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the claimant's symptoms. *See Cook*, 783 F.2d at 1173 (stating that without identifying the relevant listings and comparing the claimant's symptoms to the listing

18

criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) (unpublished opinion) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." (quoting *Cook*, 783 F.2d at 1172)).  In this case, the ALJ identified Listing 12.05 as a relevant listing [R. 13], which the parties do not dispute.   As stated above, Plaintiff contends the ALJ should have found that he meets the requirements of Listing 12.05C.  Listing 12.05C reads as follows:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

To meet Listing 12.05, a claimant must satisfy the "diagnostic description" in the introductory paragraph and any one of the four sets of criteria—A, B, C, or D.[9]  *Id.* § 12.00A.  The diagnostic description describes mental retardation as "significantly sub-

---

[9]The ALJ also determined that Plaintiff did not meet the criteria of Listings 12.05A, B, and D [R. 13–14]; Plaintiff, however, does not challenge these findings.

average general intellectual functioning with deficits in adaptive functioning." *Id.* § 12.05.

The Administration "has never adopted a standard of measurement for the term 'deficits

in adaptive functioning' in the capsule definition of Listing 12.05." *Wall v. Astrue*, 561 F.3d

1048, 1073 (10th Cir. 2009) (Holloway, C.J., dissenting).  The Administration has noted,

however, that the definition of mental retardation in the listings is "consistent with, if not

identical to, the definitions of [mental retardation] used by the leading professional

organizations."[10]  Technical Revisions to Medical Criteria for Determinations of Disability,

67 Fed. Reg. 20,018-01, at 20,022 (Apr. 24, 2002).  *But see Cox v. Astrue*, 495 F.3d 614,

618 n.4 (8th Cir. 2007) (noting that "the medical standard for mental retardation is not

identical to the legal standard").

    Medical professional organizations have stated that deficits in "adaptive functioning"

can include limitations in areas such as communication, self-care, home living,

social/interpersonal skills, use of community resources, self-direction, functional academic

skills, work, leisure, health, and safety.  *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)

(quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental

Disorders* 41 (4th ed., Text Revision 2000) [hereinafter DSM-IV-TR]) (noting the similarity

---

[10] The Administration explained that, in the United States, each of the four major professional organizations has its own definition.  Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, at 20,022 (Apr. 24, 2002).  However, although each requires "significant deficits in intellectual functioning," which is evidenced by low IQ scores, "age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.*  The Administration has discussed the definitions utilized by the American Psychiatric Association but has specifically stated that it endorses no organization's methodology over another.  *Id.*  In fact, when the Administration revised the listings in 2002, it declined a proposal to incorporate the American Psychiatric Association definition of mental retardation into Listing 12.05.  *Id.*  The Administration's definition "establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Id.* In this case, the Court refers to the definition in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*.

between the American Association on Mental Retardation and the American Psychiatric Association's definitions of mental retardation[11]).

To meet the criteria of Listing 12.05C, in addition to satisfying the diagnostic description, the claimant must establish he has an IQ between 60 and 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05C. The presence of a significant work-related limitation of function that renders the claimant unable to perform his past relevant work satisfies the "additional and significant" requirement of Listing 12.05C. *Rainey v. Heckler*, 770 F.2d 408, 410–11 (4th Cir. 1985). Further, to satisfy the "diagnostic description" in the introductory paragraph, the claimant's deficits in adaptive functioning must have "initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[12] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

### *The ALJ's Listing 12.05C Analysis*

The ALJ evaluated Plaintiff's impairments under Listing 12.05C and found that the Listing requirements were not met. The ALJ explained

> In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. School records revealed that the claimant received a full-scale IQ of 69 in

---

[11] The Fourth Circuit has approved the use of the American Association of Mental Retardation's standards for measuring adaptive skills in reviewing the denial of a writ of habeas corpus under 28 U.S.C. § 2254. *See Green v. Johnson*, 515 F.3d 290, 302 (4th Cir. 2008), *cert. denied*, 128 S. Ct. 2999 (2008) (finding Virginia Supreme Court's determination that the petitioner had failed to show he was mentally retarded was not contrary to clearly established federal law).

[12] Medically, a diagnosis of mental retardation requires a finding that the patient's intellectual limitations began in childhood. DSM-IV-TR, *supra*, at 54.

March 1978 and a full-scale IQ score of 72 in October 1981. (Exhibit 1E)  Notably, Exhibit 1E/18 reflects an assessment of borderline intelligence when he was 15. In May 2010, WAIS-IV testing revealed that the claimant had a full-scale IQ score of 69, which the examiner, Dr. Mark McClain, reported placed the claimant in the extreme high end of the mild range of mental retardation through the borderline range of intelligence. (Exhibit 5F) Nevertheless, the undersigned notes that manuals for WAIS-III, WAIS-IV, WISC-III and WISC-IV caution that a person cannot be considered to be mentally retarded based on their IQ score alone. Other factors to consider are a person's ability to be independent in their activities of daily living, their performance or measures of academic achievement and memory, whether or not they have been successfully employed, and how much formal education the individual has had. The undersigned notes that the claimant was in some special education classes in school and completed the twelfth grade with just a certificate of attendance. Despite this, the undersigned notes that the claimant was able to successfully perform his past work as a delivery person and janitor, which was described in the record as semi-skilled. (Exhibit 10E) Additionally, in April 2010, it was reported that the claimant was able to live alone, prepare his own meals, read, watch television and perform light household chores.  He was also able to attend church and go fishing with a friend on occasion. Furthermore, it was reported that the claimant could handle his own finances, if he had his own money. (Exhibit 6E, 8E) The claimant's adaptive functioning, as evidenced by his ability to perform activities of daily living and social functioning, as explained above, is more consistent with a finding of borderline intellectual functioning and not mental retardation. Therefore, based on the claimant's past semi-skilled work and his ability to perform activities of daily living, the undersigned finds that the claimant suffers from only borderline intellectual functioning and not mental retardation.  As such, Paragraph C is inapplicable as, for the above-mentioned reasons, the undersigned rejects a diagnosis of mild mental retardation.

[R. 13–14.]

***Plaintiff's Symptoms***

*Adaptive Deficits*

A review of the case law suggests that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. *Accord Salmons v. Astrue*, No. 5:10CV195–RLV, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012).  Cases interpreting Listing 12.05 provide some parameters for an ALJ's conclusion on this issue.  *Compare Hancock*, 667 F.3d at 475–76 (affirming Commissioner's determination that claimant did not have the requisite deficits in adaptive functioning where the claimant had worked as a battery assembler and a drop clipper; performed tasks such as shopping, paying bills, and making change; took care of three small grandchildren at level acceptable to the State Department of Social Services; did a majority of the household chores, attended school to obtain a GED; and did puzzles for entertainment) with *Rivers v. Astrue*, No. 8:10–cv–314–RMG, 2011 WL 2581447 (D.S.C. June 28, 2011) (reversing finding of no deficits in adaptive functioning where claimant was functionally illiterate, showed poor academic performance with multiple IQ tests in or before the third grade showing scores in the 50s, and dropped out of school in the ninth grade).  Cases interpreting Listing 12.05C also provide instruction on the factors that play into this determination.  For example, even though IQ range constitutes the Prong 2 determination, the actual score is often considered in conjunction with the level of adaptive functioning. *See, e.g., Conyers v. Astrue*, No. 4:11–CV–00037–D, 2012 WL 3282329, at *8 (June 29, 2012), *adopted in* 2012 WL 3283285 (E.D.N.C. Aug.10, 2012); *Holtsclaw v. Astrue*, No. 1:10CV199, 2011 WL 6935499, at *4 (W.D.N.C. Dec.30, 2011)

23

(both discussing IQ score when considering the level of adaptive functioning at the Prong 1 inquiry); *see also Norris v. Astrue*, No. 7:07–CV–184–FL, 2008 WL 4911794, at *3 (E.D.N.C. Nov.14, 2008) (noting that a diagnosis of mental retardation is possible with an IQ score of 70–75 when there are significant deficits in adaptive behavior and may not be supported even with an IQ score of below 70 when there are no significant deficits). Moreover, in the absence of any evidence of a change in the claimant's intelligence functioning, the law assumes that the claimant's IQ has remained relatively constant. *Luckey*, 890 F.2d at 668. Similarly, a claimant's diagnosis, if there is one, is pertinent: when a claimant has been diagnosed as mildly mentally retarded in a Listing 12.05C case, courts are more likely to affirm a finding of deficits in adaptive functioning prior to age 22 than if the claimant has the lesser diagnosis of borderline intellectual functioning. *Conyers*, 2012 WL 3282329, at *9 (discussing claimant's level of adaptive functioning and noting that the claimant was classified in the low end of the spectrum of mildly mentally retarded); *Salmons*, 2012 WL 1884485, at *5 (discussing claimant's level of adaptive functioning and noting that the claimant was classified in the borderline intellectual functioning category).

Whether the claimant is illiterate is also an important factor. *See Luckey*, 890 F.2d at 668–69; *Salmons*, 2012 WL 1884485, at *7; *Holtsclaw*, 2011 WL 6935499, at *4; *Rivers*, 2011 WL 2581447, at *3–4. Similarly, whether the claimant has ever lived independently is a relevant inquiry. Compare *Salmons*, 2012 WL 1884485, at *4 with *Holtsclaw*, 2011 WL 6935499, at *5. Another guiding factor is whether the claimant has ever provided care for others, or, conversely, whether he himself is dependent on others for care. Compare *Salmons*, 2012 WL 1884485, at *7 (noting claimant was heavily dependent on his mother

24

and was not responsible for the care or supervision of anyone else) and *Holtsclaw*, 2011 WL 6935499, at *4–5 (noting claimant had never lived independently and required a parent's help) with *Hancock*, 667 F.3d at 475–76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and *Caldwell v. Astrue*, No. 1:09cv233, 2011 WL 4945959, at *3 (W.D.N.C. Oct.18, 2011) (noting claimant assisted in the care of an elderly parent).

School records and past academic performance are also important indicators of deficits in adaptive functioning prior to age 22. *See Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22."); *Rivers*, 2011 WL 2581447, at *3 (noting that claimant was classified as special needs at school, had repeated evaluations in elementary school with IQ scores all in the 50s, and dropped out of school in the ninth grade); *see also Conyers*, 2012 WL 3282329, at *8–9 (discussing the claimant's school history). Additionally, work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *Luckey*, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475–76 (concluding ALJ's finding that the claimant did not manifest requisite deficit in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); *Harts v. Astrue*, No. 10-CV-1893, 2012 WL 529982, at *6 n. 3 (D.S.C. Jan. 30, 2012) (distinguishing *Luckey* because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning and because the claimant in *Harts* did not otherwise meet the

25

Listing 12.05C criterion of a valid IQ score within the range of 60–70), *adopted and incorporated in* 2012 WL 529980 (D.S.C. Feb. 17, 2012). Finally, the tasks a claimant is able to undertake, although not determinative, have been considered in this analysis. *See generally Radford v. Astrue*, No. 5:08–CV–421–FL, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009) (finding that the claimant's ability to perform certain tasks was not inconsistent with mild mental retardation); *Hancock*, 667 F.3d at 476 & n. 3 (affirming ALJ's consideration of the claimant's ability to perform tasks such as shopping, paying bills, and making change); *Salmons*, 2012 WL 1884485, at *7 (discussing claimant's inability to do household chores, cook, and drive).

### *Evidence of Record*

Plaintiff's educational records from the Charleston County School District, dating from January 1972 to July 1988, show that Plaintiff had considerable difficulties in school. [*See* R. 127–153.]  Plaintiff was referred for psychological evaluation on March 7, 1978, and received a Verbal IQ score of 64, a Performance IQ score of 78 and a Full Scale IQ score of 69 on the Wechsler Intelligence Scale for Children Revised.  [R. 135, 139.]  Notes dated June 1978, when Plaintiff was approximately twelve years old,[13] indicate Plaintiff was referred to the resource program; he was not a behavior problem, "tries hard, but gets poor results."  [R. 129.]

The Wide Range Achievement Test ("WRAT"), administered to Plaintiff when he was in sixth grade, shows Plaintiff's reading level at 2.2, spelling level at 2.6, and math level at 2.3. [R. 149.]  WRAT testing from seventh grade show Plaintiff's reading level at

---

[13]Plaintiff was born February 2, 1966. [R. 105.]

3.6, spelling at 3.0, and math at 3.3. [R. 150.]  Notes from Plaintiff's Annual Individual Education ("AIE") Plan from 1979 through 1980 while in the seventh grade indicate that Plaintiff exhibited difficulty following oral directions in reading and language classes, exhibited difficulty comprehending oral information in reading and language classes, and that his sight vocabulary was at a low second grade level.  [R. 138.]  The AIE Plan also noted Plaintiff's IQ at 61, with his reading at grade level 2.2, spelling at 2.6, and math at 2.3.  [*Id*.]  Plaintiff was again referred to psychological services for re-evaluation by the school psychologist in October 1981 while in ninth grade at Wando High School for continued placement in resource classes. [R. 139.] Notes from the evaluation indicate that his middle school teachers described him a functioning far below his current grade placement.  [*Id*.]  The teachers noted "he has not made significant gains in levels of achievement.  He gets extremely frustrated with work that is 'too easy' or 'too hard' for him.  Benefits mostly from on-level materials and individualized instruction."  [*Id*.]  On the Wechsler Intelligence Scale for Children-Revised ("WISC-R"), Plaintiff received a Verbal Score of 67, Performance Score of 82, and a Full Scale Score of 72 (plus or minus five points being the standard error of measurement).  [R. 141.]  The evaluator noted that while Plaintiff's Verbal Scale yielded a fairly flat profile, his Performance Scale yielded a scattered profile, indicating Plaintiff has a relative strength in non-verbal area, particularly in manual tasks.  [*Id*.]  The evaluator concluded Plaintiff possessed some non-verbal reasoning skills approaching average for his age, but continued to experience difficulty with the acquisition of language skills a well as computational skills; Plaintiff was continued in resource classes with placement in a self-contained class to be considered if the need for more restrictive placement was demonstrated.  [R. 142.]

27

WRAT testing from eighth grade shows Plaintiff functioning at a 3.3 grade reading level, a 2.7 grade spelling level, and at 3.0 grade math level.  [R. 152.]  Plaintiff's IEP for ninth grade, during 1983 through 1984, indicates he was considered "passing for certificate of credit" for math, clinical reading, and pre-vocational and qualified to continue in resource placement.  [R. 137.]  Plaintiff received his certificate of completion in 1984. [R. 263.]

On May 20, 2010, at age 44, Plaintiff underwent a psychological evaluation by Dr. Mark McClain of Behavioral Associates, in order to aid in determining Plaintiff's eligibility for SSI.  [R. 263.]  Dr. McClain administered the Welcher Adult Intelligence Scale-IV ("WAIS-IV") on which Plaintiff scored a Full Scale Score of 69.  [R. 264.]  Dr. McClain opined that Plaintiff's results "suggest that there is a 95% probability that [Plaintiff's] true Full Scale IQ score will fall between 66-75.  This places him in the extremely high end of the mild range of mental retardation through borderline range of intelligence as measured by this instrument."  [R. 264–265.]  Dr. McClain further opined that Plaintiff "obtained scores in the deficient range on the Word Reading, Spelling, and Math Computation subtests of the WRAT-4" [R 265] and indicated his diagnosis as "rule/out 317 mild mental retardation vs V62.89 borderline intellectual functioning."  [R. 266.]  Dr. McClain also explained:

> In summary, testing results, behavioral observation and clinical interview reflect a 44-yer-old [sic] male who is currently functioning in the mild range of mental retardation through borderline range of intelligence and in the deficient range of overall academic achievement as measured by the WIS-IV and WRAT-4 respectively.  Current test results are generally congruent with the results of past psychoeducational testing conducted by a school psychologist.

28

[R. 266.]   Additionally, a Mental Residual Functional Capacity ("MRFC") Assessment conducted on June 3, 2010, by Lisa Clausen, PhD, indicated Plaintiff was moderately limited in his ability to understand and remember detailed instruction; in his ability to carry out detailed instructions; and in his ability to maintain attention and concentration for extended periods of time.  [R. 289.]

*Analysis re: Evidence of Adaptive Deficits*

As stated above, a diagnosis of mental retardation is possible with an IQ score of 70–75 when there are significant deficits in adaptive behavior; additionally, such diagnosis may not be supported even with an IQ score of below 70 when there are no significant deficits.  *See Norris v. Astrue*, 2008 WL 4911794, at *3.   "Adaptive functioning refers to how effectively an individual copes with common life demands and how well [he] meets the standards of personal independence expected of someone in [his] particular age group, sociocultural background, and community setting."  *Caldwell v. Astrue*, 2011 WL 4945959, *3 (W.D.N.C. Oct, 18, 2011) (Reidinger, J.) (quoting Diagnostic and Statistical Manual of Mental Disorders ("DSM") (4th ed. text rev. 2007)).   As noted, examples of "[d]eficits in adaptive functioning [may] include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety."  *Jackson v. Astrue*, 2012 WL 580239, *3 (4th Cir. 2012) (unpublished) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)); *Caldwell*, 2011 WL 4945959, *3 ( internal citation omitted).   Moreover, as stated previously, to satisfy the "diagnostic description" in the introductory paragraph of Listing 12.05C, the Plaintiff's deficits in adaptive functioning must have initially manifested during

29

the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

Upon review of the ALJ's decision, it is unclear whether the ALJ found Plaintiff initially manifested deficits during the developmental period or whether those deficits were dismissed due to Plaintiff's activities of daily living. The ALJ concludes that Plaintiff's "adaptive functioning, as evidenced by his ability to perform activities of daily living and social functioning, as explained above, is more consistent with a finding of borderline intellectual functioning and not mental retardation." [R. 14.] Again, the proper inquiry is whether the record supports a finding of deficits in adaptive functioning prior to age 22, which the ALJ failed to properly consider. Additionally, the ALJ failed to explain how he came to the medical conclusion that Plaintiff's activities of daily living were "more consistent with a finding of borderline intellectual functioning and not mental retardation" when the medical experts could not make that conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, an ALJ is "simply not qualified to interpret raw medical data in functional terms . . . ."); *see also Manso–Pizarro v. Sec'y of Health & Human Services*, 76 F.3d 15, 17 (1st Cir. 1996) (stating that "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record"); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.");

*Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) ("Because an Administrative Law Judge as a rule is not a doctor, he should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony.")

As Plaintiff points out, the Court notes that the record supports a finding that Plaintiff suffers from deficits in "functional academic skills," one of the skill areas under the DSM–IV–TR definition of mental retardation. DSM–IV–TR at 41. The record shows that Plaintiff exhibited poor academic performance, graduating with only a certificate of completion; exhibited poor reading, writing, and math skills at no higher than a third grade level; and produced multiple IQ test scores in or before the ninth grade showing scores below 70. *See Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22."). Additionally, the MRFC Assessment conducted by Lisa Clausen, PhD, found Plaintiff was moderately limited in his ability to understand and remember detailed instruction; in his ability to carry out detailed instructions; and in his ability to maintain attention and concentration for extended periods of time [R. 289], indicating limitations in adaptive functioning in his social/interpersonal skills. The ALJ also confirmed Plaintiff's difficulties in adaptive functioning in his social/interpersonal skills. [*See* R. 14 (noting Plaintiff experienced mild difficulties in maintaining social functioning; mild to moderate difficulties in maintaining concentration, persistence, or pace)]. Thus, upon consideration of the record, the Court finds the ALJ's conclusion that Plaintiff did not exhibit deficits in adaptive functioning, even in light of his activities of daily living, is not supported by substantial evidence.

*Manifestation During the Developmental Period*

The ALJ concedes the evidence demonstrates or supports the onset of the impairment before age 22.  [R. 13.]  Evidence of illiteracy despite a claimant's education supports a finding that the claimant's mental retardation occurred before age 22.  *Turner v. Bowen*, 856 F.2d 695, 699 (4th Cir. 1988); *see also Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (relying on school records and an IQ examination administered after the claimant's developmental period to establish that the claimant exhibited deficits in adaptive functioning prior to age 22).  Moreover, "in the absence of any evidence of a change in a claimant's intelligence functioning, it *must be assumed* that the claimant's IQ remained relatively constant." *Luckey v. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (emphasis added) (citing *Branham*, 775 F.2d at 1274).  The Commissioner has recognized that an individual's IQ tends to stabilize by age sixteen; that consistency among sub-test scores increases confidence in the test's accuracy; and that the practice of inferring low IQ during the developmental period from testing done later in life has been approved.  *Davis*, 2008 WL 1826493, at *4 (citing 65 Fed. Reg. 50,746, at 50,772 (Aug. 20, 2000)).

Based on a review of the record, the ALJ's finding that Plaintiff "does not have a valid verbal, performance, or full scale IQ of 60 through 70" is not only plain error, but it is reversible error.  "Generally, the results obtained by a licensed psychologist following the administration of accepted intelligence tests are entitled to considerable weight in Social Security cases although they are not required to be accepted." *Maybank v. Astrue*, No.4:08–0643–MBS, 2009 WL 2855461, at *11 (D.S.C. Aug. 31, 2009) *(citing Clark v.*

32

*Apfel*, 141 F.3d 1253, 1255 (8th Cir.1998); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986)).  However, the Commissioner may "reject such scores if they are inconsistent with other substantial evidence in the record such as conflicting professional opinions or other record evidence indicating that the claimant is historically higher achieving or has more advanced functional capacities than would be expected from someone with a below-average I.Q." *Maybank*, 2009 WL 2855461, at *11 (citing Clark, 141 F.3d at 1255).

Not only does the record support such a finding, but Dr. McClain performed a psychometric assessment confirming the findings of the school psychologist and likewise finding Plaintiff's Full Scale IQ score to fall within the range of Listing 12.05C.  [R. 266.] Dr. McClain, who performed the additional testing when Plaintiff was 44 years old, also stated that the test results were valid, consistent with his findings, and characterized them as falling "on the edge between Mild Mental Retardation and Borderline intellectual functioning."  [*Id.*]

The law is clear that the Commissioner may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions or other record evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average IQ.  *Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998).  But here, the ALJ's personal observations, without support from other evidence or professional opinions, cannot constitute substantial evidence to support the rejection of the plaintiff's IQ score.  Further, the Court notes that

when the Plaintiff meets the requirements of Listing 12.05C, the ALJ cannot use the Plaintiff's work experience against him to exempt him from the Listing.

Additionally, the record supports a finding of deficits of adaptive functioning prior to age 22 (with records of IQ scores before and after age 22 in the range required by Listing 12.05C and the presence of other deficits of adaptive learning as discussed above). It appears, however, that the ALJ merely disregarded this evidence because Plaintiff was able to attend to his personal care, prepare meals, fish, perform some household chores, attend church, maintain friends [R. 17], and because a consultative examiner determined Plaintiff was capable of handling his own personal financial and legal affairs [R. 186 ( "He is capable of handling his own finances if he had any income.")].  Apparently based also on the findings of the consultative examiner, the ALJ found Plaintiff could follow simple directions and pay his own bills.  [R. 17.]  Plaintiff testified, however, that he cannot read a newspaper or write a letter; can add/subtract small numbers; lives next to his mother and sister because they cook his meals for him, help him fill out applications, and help him with cleaning.  [R. 30–31.]  Plaintiff's sister also testified that she and her mother take care of Plaintiff's basic necessities–-food and transportation.  [R. 34.]

Moreover, the quality and character of the work performed by Plaintiff—working sporadically as a day porter and doing landscaping [R. 155–156]; or working as a janitor, cook/dishwasher, kitchen help, or delivery person at a work site [R. 176]—hardly overcomes the presumption that Plaintiff's IQ was constant over his life.[14]  Importantly, the

---

[14] As to Plaintiff's work history, some Courts of Appeals do allow such evidence to be used to challenge a claimant's IQ score. *See, e.g.*, *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) (citing *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995) ("Nothing in [claimant's] prior work history or educational background . . . supports an I.Q. so low as to reflect mild mental retardation."); *Popp v. Heckler*, 779 F.2d 1497, 1499–1500 (11th Cir. 1986) (finding a claimant's IQ scores were properly discredited where the scores were inconsistent

United States Court of Appeals for the Fourth Circuit has held that, where the Listing 12.05C criteria are met, the Commissioner "may not rely upon previous work history to prove non-disability . . . : 'When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap.'" *Luckey*, 890 F.2d at 669 (quoting *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (stating that when a claimant satisfies a listing by meeting all its specified medical criteria, she presumably qualifies for benefits); *Ambers v. Heckler*, 736 F.2d 1467, 1469–70 (11th Cir. 1984) (finding that a mentally retarded claimant who was gainfully employed in the past is disabled upon the cessation of employment).  As more fully explained by one district court:

> [The] DSM-IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be able to work. However, they recognize that some mildly mentally retarded individuals may be unable to work where they have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).  This listing implies that such an individual will be able to work unless he has, or until he develops, a severe physical or additional mental impairment.  *Therefore, the fact that plaintiff has a history of continuous employment in the past is irrelevant to whether he has subsequently become disabled due to the development of additional severe impairments.*

*Muntzert v. Astrue*, 502 F. Supp. 2d 1148, 1158 (D. Kan. 2007) (emphasis added); *see also Davis*, 2008 WL 1826493, at *4 ("While [the claimant] had been able to function in a work setting, listing 12.05C anticipates that a [claimant] of limited intellectual ability will be

---

with the claimant's college record and work history as an algebra teacher); *Muse v. Sullivan*, 925 F.2d 785, 789–90 (5th Cir. 1991) (finding IQ results questionable in light of the claimant's work experience, education, and demeanor at the hearing)).  However, reliance on a claimant's work history to reject IQ scores is rejected in the Fourth Circuit.  *See Luckey*, 890 F.2d at 669 (quoting *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)).

more severely limited, and disabled when faced with other severe impairments."). Therefore, the ALJ's use of work history to deny benefits constitutes the application of an improper legal standard and does not constitute substantial evidence to support the ALJ's conclusion. Accordingly, the Court finds the ALJ's conclusion that there was no evidence of manifestation during Plaintiff's developmental phase is unsupported by substantial evidence.

                    *IQ Score*

        To meet Listing 12.05C, the claimant must show a "valid verbal, performance, or full scale IQ of 60 through 70." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. The ALJ does not determine whether IQ scores are legitimate. *See Jackson v. Astrue*, No. 8:08-2855, 2010 WL 500449, at *5 (D.S.C. Feb. 5, 2010) (finding the ALJ improperly interpreted evidence when the ALJ, on his own, not by weighing conflicting medical opinions, found the plaintiff's daily activities did not comport with her IQ scores); *see also Murphy*, 496 F.3d at 634 ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Nguyen*, 172 F.3d at 35; *Davis v. Heckler*, 884 F.2d 1394, 1989 WL 104466, at *4 (9th Cir. Sept. 1, 1989) (unreported table decision) (finding an ALJ impermissibly substitutes his opinion for that of a treating physician when the ALJ rejects a physician's opinion that rests on substantial medical evidence); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("[A]n ALJ is not free to set his own expertise against that of a physician who presents competent evidence."). Although the regulations permit the ALJ to consider evidence in addition to an IQ score, a general discussion of the claimant's activities and an ALJ's intuition are not sufficient to overcome medical evidence; the ALJ

cannot substitute his own judgment and disregard IQ scores.  *Dozier v. Comm'r of Soc. Sec.*, 736 F. Supp. 2d 1024, 1037 (D.S.C. 2010).  As stated in *Maybank v. Astrue*,

> Generally, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases although they are not required to be accepted.  The Commissioner may, however, reject such scores if they are inconsistent with other substantial evidence in the record such as conflicting professional opinions or other record evidence indicating that the claimant is historically higher achieving or has more advanced functional capacities than would be expected from someone with a below-average I.Q.  Indeed, test results of this sort should be examined to assure consistency with daily activities and behavior.

No. 4:08-643, 2009 WL 2855461, at *11 (D.S.C. Aug. 31, 2009) (internal citations omitted); *see also Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003) (same); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) (citations omitted) (same).

In this case, there is no evidence in the record that indicates Plaintiff's IQ scores are conflicting or inconsistent with his functional capacities.  As evidenced above, intellectual testing performed in 1978 (at age 12), in 1979 (at age 13), and in 1981 (at age 15), resulted in full scale IQ scores of 69, 61, and 72, respectively.  Testing done at age 44 resulted in a full scale IQ score of 69.  The Court notes the Commissioner has recognized that an individual's IQ tends to stabilize by age sixteen; that consistency among sub-test scores increases confidence in the test's accuracy; and that the practice of inferring low IQ during the developmental period from testing done later in life has been approved. *Davis*, 2008 WL 1826493, at *4 (citing 65 Fed. Reg. 50,746, 50,772 (Aug. 20, 2000)). Therefore, the ALJ's disregard of Plaintiff's IQ scores, in light of all other evidence of record, is not supported by substantial evidence.

*Physical or Other Mental Impairment*

If the claimant's IQ falls within the range required by Listing 12.05C, then the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C; *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984).  While a claimant may have previously been able to function in a work setting, Listing 12.05C anticipates that a claimant of limited intellectual ability will be more severely limited, and disabled, when faced with other severe impairments. *Davis*, 2008 WL 1826493, at *4.  The "work-related limitation of function" requirement is satisfied when the claimant is determined to have a severe impairment at Step Two of the evaluation process.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *see also Luckey*, 890 F.2d at 669 (holding that a claimant satisfies the second prong of § 12.05C if the claimant has either an additional severe impairment or cannot perform his past relevant work).  Because the ALJ found Plaintiff suffers from the "severe impairments" of asthma and borderline intellectual functioning [R. 12], the second prong of 12.05C is satisfied.

**Remand for Additional Proceedings or for an Award of Benefits**

Whether to remand for additional proceedings or for an award of benefits is generally approached on a practical level, and the decision rests within the sound discretion of the district court.  *Smith v. Astrue*, No. 3:10-66, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)).  An award of benefits is more appropriate when further proceedings would serve no useful purpose.  *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1985).  Likewise, an award of

38

benefits is appropriate when substantial evidence indicates the claimant is disabled, and the weight of the evidence indicates a remand would only delay the receipt of benefits while serving no useful purpose or a substantial amount of time has already passed. *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982).   Further, an award of benefits is appropriate when the Commissioner has had an opportunity to develop the record on an outcome-determinative issue and has failed to produce substantial evidence, *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983); *Tennant,* 682 F.2d at 710–11; *Edwards*, 672 F. Supp. at 237, or where "there is not the slightest uncertainty as to the outcome" and additional proceedings "would be an idle and useless formality," *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969); *see also Barry v. Bowen*, 862 F.2d 869, 1988 WL 124873, at *2 (4th Cir. 1988) (unpublished opinion) (citing *NLRB*, 394 U.S. at 766 n.6).   On the other hand, additional proceedings are appropriate where they could remedy defects. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989).

A review of the record and relevant case law reveals that this matter should be reversed and remanded for an award of benefits.  Plaintiff applied for benefits in January 2010, alleging an onset of disability date of June 2008 [*see* R. 99–108], indicating a substantial amount of time has passed since Plaintiff applied for benefits.  Further, the Court finds the ALJ's decision that there is no evidence of adaptive deficits or manifestation before age 22 is not supported by substantial evidence.  Rather, the Court finds that substantial evidence in the record as a whole indicates Plaintiff is disabled in accordance with Listing 12.05C, and the weight of the evidence indicates remand would only delay the

receipt of benefits, while serving no useful purpose because there is no additional information to be developed in the record to remedy any defects.  Accordingly, in this case, an outright award of benefits is appropriate.

## CONCLUSION

Wherefore, based on the foregoing, it is ordered  that, pursuant to the power of this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision under sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3), the Commissioner's decision be REVERSED and the case be REMANDED to the Commissioner for an award of benefits to Plaintiff based on a disability commencing June 3, 2008.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States Magistrate Judge

February 25, 2014
Greenville, South Carolina